Good morning, Your Honors. This case is about the City of Norfolk's censorship of core political speech. The City ordered Central Radio to remove a banner protesting the unlawful taking of its property. The City did this despite having ignored the many other comparably sized signs throughout the City, despite the fact that it has not enforced its sign code against any other political sign in at least the last quarter century. It suddenly took this unprecedented step against Central Radio because the Old Dominion University Real Estate Foundation, the very entity that stood to acquire Central Radio's property from the illegal taking, complained about the banner. The City's enforcement in this case was unconstitutional for three reasons. First, the sign code provisions it relied upon were content-based. Second, even if they're assumed to be content-neutral, they cannot withstand intermediate scrutiny. And third, Your Honors, the enforcement against Central Radio in this case was unconstitutional selective enforcement. What kind of relief are you asking for here? Your Honor, we are asking that the judgment of the Court of Appeals be reversed and judgment entered in Central Radio's favor. But what are you asking for? Your Honor, we are asking for a declaration and injunctive relief, both prospective and retrospective. So that you can put up the same sign? Your Honor, Paragraph 103 of our complaint specifically alleges that Central Radio would be, would like to, and desires to, put up similarly sized signs in the same location in the future. However, we've also specifically requested retrospective relief because the City prohibited from having this sign throughout the pendency of the condemnation proceeding. I guess what I need clarification on, Counsel, is the fact that the eminent domain issue is over, right? Yes, Your Honor. Right, the Virginia Supreme Court took care of that? That's correct, Your Honor. Okay. So now your request for relief from the sign ordinance is to be able to put up any signs, essentially of any size, because they selectively enforced it on one occasion in the past? That's not quite it, Your Honor. First of all, we've specifically requested for retrospective and prospective relief. Retrospective relief, at a minimum, this particular application to Central Radio was unconstitutional and we're entitled to a declaration and a dollar in nominal damages for the City having violated its rights in the past. My answer, I guess, is what I'm more interested in here. Exactly what form is this relief going to take? Your Honor, we seek a declaration and an injunction prohibiting the enforcement of sign code. At all? As to Central Radio? Both facially and as applied to Central Radio, Your Honor, because the sign code provisions are, first of all, content-based and, as I mentioned, can't survive even intermediate scrutiny. Why are they content-based? Your Honor, these provisions are content-based under this Court's jurisprudence because they are a clear instance of the government treating messages differently based solely on which message it deems more important. The City admitted as much. When asked why it creates exemptions for governmental flags, for example, it testified, we believe that's the right thing to do. And when asked why it's okay for a property owner to have an enormous governmental flag on the side of his or her building, but not okay to have a similarly sized non-governmental or non-religious flag, such as a sports flag, the City again testified, we consider the importance of the American flag or a state flag to far exceed that of an enthusiastic sports flag. In other words, Your Honor, the governmental flag, the religious flag, is permitted because the government thinks it's more important. And what this means in practice is that you can have an enormous City of Norfolk flag on the side of your building, but Central Radio's banner protesting the City of Norfolk policy is prohibited. As a matter of fact, you could have the official flag of Syria, couldn't you? You could, Your Honor. As a government. Absolutely. The United Nations, the People's Coat of Arms, you could have, I'm certainly not equating these things, but you're absolutely correct, Your Honor. But a banner on the same size, same location, protesting City policy is prohibited. That is content-based under any sense of the term. Moreover, as Central Radio notes in its brief, this Court's sister circuits have struck down virtually identical exemptions on a number of occasions. But this circuit never had. This circuit has not had occasion to address those types of distinctions, Your Honor. But certainly... Other cases that had similar code provisions. I don't believe there are any that have similar code provisions to this, Your Honor, where the government gives preference to certain speech based solely on the fact that it favors the message communicated by that speech. And now, Your Honor, the Supreme Court may well endorse the reasoning of this Court's granted cert on. But the bottom line, however, is that even under this Court's current jurisprudence, these provisions are content-based. In fact, these provisions cannot even withstand intermediate scrutiny, assuming that they are content-neutral. To survive intermediate scrutiny, the government has to prove the constitutionality of its regulations. And that requires evidence. As this Court held en banc in Davenport v. City of Alexandria, intermediate scrutiny requires the government to offer, quote, detailed proof and a strong factual justification for the regulation. As the Court more recently stated in Giovanni Garandola, it requires the government to produce evidence that a challenge regulation materially advances an important or substantial interest by redressing past harms or preventing future ones. Here, the government has proffered no evidence of the supposed harms to be addressed. And in fact, it admits that Central Radio's banner presents no harm at all. It admitted in its interrogatory responses that there are, quote, that there are no problems with the, I'm sorry, that it was unaware of any safety problems with Central Radio's sign. Did they talk about distracted drivers and honking their horns when they saw the sign? The district court, Your Honor, considered it to be evidence supporting the regulation that certain drivers, when they saw the sign, honked in approval. That's not evidence of distraction, Your Honor. That's evidence of agreement with the message on the sign. Why is it that it's equally being inferred as a distraction? Your attention is diverted whether you agree or disagree. Your Honor, this case is much, I do not believe that's the case, Your Honor. And this case is much different from this court's. Why not? Your Honor, in the one case where this court has found honking to be evidence. Let's go back to common sense. You see the sign, whatever it says. You disagree with it, you're distracted because you've seen the sign. If you agree with it, you're distracted because you've seen the sign. What's wrong? Why is that incorrect? Your Honor, it's incorrect because the city itself has acknowledged there is no evidence of a traffic safety problem. By that reasoning, Your Honor, anytime someone responds to a sign, be it a stop sign, they're distracted. Be it a slow children at play sign, they are distracted. Be it a sign protesting governmental abuse, they're distracted. Your Honor, it's not evidence of distraction. It's evidence of agreement. This court in Brown did find that specific evidence of honking to a sign where the sign distracted not only motorists but a police officer because of its bright fluorescent lettering was evidence of distraction. But that was distraction because of the physical characteristic of the sign, the fluorescent large orange lettering. Here, the honking was evidence of agreement. The Supreme Court has held in R.A.V. versus City of St. Paul, the government cannot regulate speech because of the persuasiveness of that speech. And that's precisely what the district court reasoned here. Because the sign was effective, because people agreed with it and acknowledged that agreement, that was somehow evidence of distraction. That is not the case, Your Honor. It's evidence of agreement. Now, Your Honor, the, again, even assuming the case that the sign code is subject to intermediate scrutiny, it cannot survive also because the regulations do not leave open adequate alternatives for central radio. The Supreme Court has repeatedly held that location is often a critical component of the message of a sign, particularly a protest sign on private property. That's uniquely true here, where Central Radio's banner protesting an unlawful taking was on the very property that the government was trying to unlawfully take. In other words, it was a protest of governmental abuse at the very site of that abuse. No other sign in no other location would have been an adequate alternative to this one. And for these reasons, because the city lacks evidence and because there are no adequate alternatives, the code cannot even survive intermediate scrutiny. And finally, Your Honor, the city acted unconstitutionally here because it selectively enforced the sign code against Central Radio. To prevail on a claim for selective enforcement, plaintiff has to show discriminatory effect by the enforcement and discriminatory purpose. Central Radio has shown both. There's no question it was discriminatory effect. The fact is the city has not enforced its sign code against any other political sign in at least a quarter century. Not only has it not enforced the sign code against political signs, city officials have directed staff to ignore code violations with political signs. What other than Nautilus? Your Honor, the illegal abortion protest signs, staff were directed to ignore. The illegal anti-Obama sign, staff was directed to ignore. The oversized giant flashing Nautilus sign, staff was directed to ignore, despite the fact that the city believes flashing signs are uniquely problematic for traffic safety. OK, but Nautilus is down there at the harbor and nobody's driving. I mean, isn't that a different situation where you had that museum right on the water? Your Honor, it's not a different situation. And the fact of the matter is the city manager directed staff to ignore the sign, despite acknowledging it did not comply with code. But the Waterside Drive, you're not saying the traffic there is affected or I don't know, maybe I've got the name of the road wrong, but you're saying that that sign ordinance or that sign poses a distraction to a passing motorist? Your Honor, what we're arguing is that code does not, that sign does not comply with the sign code. The city acknowledges that it does not comply with the sign code and the city manager directed staff not to enforce it. In each instance, the message was the same. Don't enforce, don't enforce, don't enforce, until the Old Dominion University Real Estate Foundation picked up the phone and complained. And that brings us to discriminatory purpose, Your Honors. The reason the city suddenly enforced after a quarter century against Central Radio was that the Real Estate Foundation, the very entity that stood to acquire Central Radio's property from this illegal taking, took issue with the banner's message and complained. For 25 years, the city had not enforced against any political sign, a quarter century. But with Central Radio's banner criticizing the city and threatening to jeopardize ODU's acquiring of Central Radio's property, the city suddenly decided to enforce. Up to that point, the city had exercised what the district court called appropriate caution with respect to political signs. But when the ODU Real Estate Foundation called up, they threw appropriate caution to the wind and went out and cited Central Radio. As this court's decision in United States v. Crowthers, as well as the Third Circuit's more recent decision in Tenafly-Aruv Association v. Borough of Tenafly make clear, sudden enforcement after a pattern of non-enforcement against similarly situated speakers is sufficiently suggestive of discriminatory purposes. Right, but are these similarly situated speakers? I mean, Nautilus isn't a similarly situated speaker to somebody protesting eminent domain. Your Honor, someone protesting President Obama. Your Honor, someone protesting abortion. Okay, so you agree it doesn't work with Nautilus. Nautilus is really the outlier here, isn't it? I do not agree, Your Honor, because according to the city, the city's theory is that signs, large signs, present traffic safety and aesthetic problems. If that's the case, then that should be equally true. But that's right there on the harbor. It's not the same as being on a main traffic route. Your Honor, I'm not sufficiently familiar with the road layout of that particular sign to is the city asserts that traffic safety and aesthetics justify provisions, yet the city manager directed staff not to enforce against that particular sign. So, Your Honor, in every instance, the message was the same. Don't enforce, don't enforce, don't enforce until Central Radio spoke out. For these reasons, the content-based nature of the sign code provisions, because they can't even withstand intermediate scrutiny if they're assumed to be content-based or neutral, and because the code was selectively enforced against Central Radio, this Court reversed the District Court's judgment and entered judgment for Central Radio. I'd like to reserve my remaining five and a half minutes, Your Honors, for rebuttal. It has been so noted. Mr. Alita? May it please the Court, my name is Adam Alita, and I represent the City of Norfolk in this matter. I'd like to take the first part of my time to respond to the First Amendment issues and then address some of the issues that we raised on cross-appeal regarding excusable neglect toward the end of my presentation. Could you start off? Sir, it is a little fishy. You know, it's a little curious that the city doesn't enforce these signs, and then all of a sudden, you know, they're involved in this eminent domain case. I mean, I understand the City's interest in traffic safety and no distraction and the burdens of being a municipal government. I mean, there are a lot of things you've got to balance, but the timing is really curious here, and why isn't that something that should concern us? Well, Central Radio has done an effective job of suggesting that there is something fishy going on here. First of all, whether or not it's fishy does not constitute a First Amendment violation, and second of all, a close inspection of the record indicates that each of those representations really is not borne out by the facts. So to respond to the allegations about selective enforcement, after looking extensively into the City's record, well, I say looking extensively. Actually, they mention that there are 25 years' worth of no citations, but in fact, the discovery only sought written records of sign violations in the past five years. The City of Norfolk, consistent with the rules or the standards set forth by the Library of Virginia, only keeps written records of violations for three years. We produce those records, and in fact, the testimony from the one inspector who's assigned to signs exclusively says, I do almost all of my citations verbally. That's how I start. I start with a verbal, and almost everybody complies. Very rarely will you find a written citation, but those are really the only citations that Central Radio asked for, so they missed a whole panoply of oral citations and all citations that were older than three years old. Second of all, after all of that fishing, they find three cases. The Nauticus sign, which is, Your Honor, located on Waterside Drive, and then two other signs, a sign that was apparently in the right-of-way, not on any zoned property, not subject to any regulations in the sign code that protested abortion. And so it was the correct advice to say, leave that sign alone. It doesn't violate the sign code. The regulations in the sign code that applied to zoning districts don't cover a sign in the right-of-way. And then the third sign is the Obama sign, or Stop Obama, or some protest sign regarding the President, and the facts as they came out were that the sign was not a violation of the sign code. There actually isn't, in the record, anything indicating the dimension, but we do have the conclusion from the enforcement staff that it didn't constitute a violation of any of the regulations of the zoning district where it's located. We don't know why they came to that conclusion, though. We don't know why they came to that conclusion. We only know that there was no finding that it was in violation. So for Central Radio to use it as evidence of a sign that violated the code but was left alone, it doesn't meet that standard. But Eric, that's why the fish in this, because they would say, why don't we know why it was exempted or not covered? We don't know. That's right. That's right. And so I understand that Central Radio is aggrandizing what are either inconsistent or inconclusive facts to turn it into a First Amendment violation. But the trial court was correct to find that really the Nautica sign is the only sign that there was actual evidence that the city directed that, even though it's a violation, that it be left alone. But still, what's missing with regard to the Nautica sign is any analysis of what the content was. And so to make the leap that it was left alone because the city favored the message on the Nautica sign, whereas the Central Radio sign was not left alone because the city disliked the Central Radio sign is just a leap of faith. The city makes money from the Nautica's exhibit, doesn't it? I honestly. Is it an admission place, correct? There is admission, but I think. You don't think the city gains income? I think you lose money on it every year, frankly. But there is a financial connection between the city and the museum. Yes, there is. The city actually funds the museum and their appropriations to finance that. Yeah, it doesn't take a leap there to find your interest would be quite different, doesn't it? And although it's not part of the record, the court should know that the sign code has since been amended, that that sign is legal today. Oh, you changed it so it's legal now? We did. One of the privileges of being the governing. Ergo, again, deficientness. You can see why it is still. So whatever the reason for leaving it alone, it does not appear to be based on the message. Essentially, what Central Radio is asking this court to do is to establish a new rule to overrule Wagmore Dogs, Town O'Carrie versus Brown, and come up with what this court has previously called a restrictive sort of Euclidean approach to the First Amendment, which requires that a regulatory scheme where the government examines the content of the message conveyed is content-based no matter the motivating purpose. That the analysis that this court does currently into whether the reasons for the regulation are related to the message or not be jettisoned, and we go with a requirement that merely contemplates whether or not the inspector looks at the sign to determine what kind of sign it is to apply the regulations. And if they have to look at the sign, then it's content-based. Yeah, but the reason for the sign code were what? Distraction and aesthetic. Correct? In summary, correct. Right, in summary. Then why do you have the flag exemption for government? Flag. Well, first of all, having a regulatory scheme that covers forms of visual expression doesn't require that you cover everything. So there can be some exemptions. The exemptions Central Radio complains of that they believe invalidates Norfolk Sign Code are not only flags, but also works of art and murals. No, no, no, don't switch from the flag. I'm still on the flag. Right, so. What does government do to furthering this interest of the government? So a determination was made by the legislative body that flags don't necessarily fall into that category of the types of things that people see that affect aesthetics or. Distract people. And so there's a blanket exception for all flags of all nations. There's no favoring any particular message that goes along with that. You favor a message of patriotism. Well, I don't, I would not. Don't you, for example, you know, you're a football fan. You got a big flag. You don't, no, that's, can't do that. But if you have a big American flag, you can fly, right? Am I correct? You can. Well, what difference does that make in terms of distraction? The government. Now, what does the government add to that at all? Like counsel said, intermediate, I'm sure you can, you can apply with any kind of standard of scrutiny that what is it? Tell me. Well, I reject the implication that. Implication is a direct question. Tell me what allowing government flag to be flown at any size adds to the stated interest of the government in the code restriction. That particular example may not. And that's, that's merely one example of all the other forms of visual speech that also may be allowed and are not regulated by the sign code, but may impact aesthetics or may impact distraction. This case goes to the ultimate of American rights. It's the fifth amendment. Now we, you know, next year we're going to celebrate the Magna Carta 800 years, but the king could not invade the barons castles and just come in taking your land. This goes to the core of constitutional questions. I can't think of anything more political. And don't we have to be very careful when we now allow, but if you flying the colors of a government, it's okay. But if you're just flying what your heart beats and a poetry or whatever football team, then we restricted based on distraction. It has no connection. And you have yet to answer my question and give me one. Uh, uh, well, I, I do, I answered, you don't know. I am, I am abiding by what this court and other courts have, including the Supreme court has deemed, uh, an appropriate, uh, risk, uh, cabining the appropriate rec, uh, regulations of the first amendment sign code restriction to not have to cover every form of visual speech that exists, that there can be some exemptions. And the fact that those exemptions take a certain format, uh, is not constitutionally infirm. So in this particular case, my formats that are content neutral, correct? Correct. But once you say government, it is no longer content neutral because it has to embrace a government. Well, I disagree in the facts of this case, Mr. Mr. Um, the, the, the principal of, um, of central radio, uh, Mr. Wilson testified that he included an American flag logo on this particular sign in order to demonstrate their connection to the defense industry. And so I don't know that that says anything about patriotism. I don't know what message that is, but most people don't put a flag in their front yard to indicate a connection to the defense industry. So the idea that a flag necessarily has a certain messages is, I think, obviated by the facts of this case. And specifically turning to the art restriction, you put no definition on art at all. That's correct. And we have done, uh, essentially what a town of carry did, which was create an exemption for art and the sign code, as with all regulations contemplates that, that, but it didn't have a definition. There was a definition. There was a, there was some guidelines as to what art was. You don't have. There was a definition, a definition that was represented to be vague. Ultimately it was not vague. I know the court upheld it, but you don't have any, you have no restrictive language as to art. I mean, you're talking about something distracting. Oh my goodness. Art can be the ultimate distracting. You could have someone with dragons coming out of their head and legs off and people would be, I mean, crashing into, but it's art. I understand. It is your honor. It's not part of central radios as applied challenge here. There's no indication that there's any art out there that the city has permitted. Um, that, uh, that, um, that that exemption that that exists in Norfolk and that that exemption somehow implicates, um, the unconstitutionality of, of what the sign code does with regard to the types of signs, the written signs that they do want to display. On the question of, um, the, uh, the excusable neglect, um, we believe that here too, central radio wants to make new law. Um, we have identified the two-part test that a finding of excusable neglect requires. Uh, first of all, the four elements of the pioneer investment services case. Um, and then second of all, a finding, an analysis that injustice would otherwise result if the extension to file is not granted. Uh, the error that the district court made with regard to the applying the pioneer test is that it treated the pioneer test as if it's a balancing test. And so, um, uh, passing some of the tests while failing other of the tests was treated, um, uh, as, uh, as a counterweight. Uh, and, and the, uh, jurisprudence of this court repeatedly has found that even the failure of one element of the pioneer test is sufficient to deny a finding that the neglect is excusable. Both the symbionics case and the Thompson case are situations where failure of that one test, the most important test, um, I believe that's correct. Um, I understand that. Um, it's an instance where the rule was applied, um, where the failure of the most important test was sufficient to, um, find that the neglect was not excusable. And so, what central radio needs the rule to be changed to, um, in order to support what the district court did in this case, um, is to require only evidence of an attempt, bona fide attempt to file on time. Um, and we believe that's not the standard. If that were the standard, Thompson would need to be reversed, uh, and symbionics would have come out differently. Um, so we ask this court. Can we take judicial notice that this pay.gov, you may have the name wrong, site that was in use at that time, created all sorts of problems for some period of time, similar to what the, uh, plaintiffs found in this case. Um, it was very hard to tell from the, when you were online accessing that and paying the money for the filing of the notice of appeal or some other process, uh, exactly what had happened. Well, that may be the district. It would be reasonable. A person could have reasonably determined based on what they saw using that website at that time that they had indeed filed. Um, I don't disagree that somebody could make that conclusion. As I said, I think that what they are, the rule they're arguing for is that a bona fide attempt to file on time, um, should be deemed excusable neglect. I think it's analogous to the Thompson case because in Thompson, the attorney put the postal service would take it to the local district court, um, had no idea it would take six days. But, but there's still a burden. They had a receipt back that said, we took your money for filing this notice of appeal. Right. And what they. Seems to be fairly different from putting it in the mail and hoping it gets there. It might have been different, but for the fact that for the next three and a half days, no NEF, notice of electronic filing was sent to any of the three attorneys who were registered through the CMECF system to get the email confirming the filing that, that never occurred. And so what's recited in Thompson as the obligation of counsel to check and make sure the thing you file before the deadline, you know, is pending got there is what didn't happen in this case. You have, you have three attorneys who didn't check on anything, who basically took the word of somebody who admittedly may have genuinely been confused by the pay.gov website. But we don't think that's where the obligation to comply with filing ends. I think that Thompson says there's another step that's required. You have to check behind that to see if that information is consistent with the other stuff you're not getting, which is the NEF. In order for you to prevail on this particular point, do we have to determine then that it was an abuse of discretion by the district judge as a matter of law to have determined that because the plaintiff got back a verification that said, we took your money for filing a notice of appeal, that that's an error as a matter of law? You do have to find that it's an abuse of discretion. But the way this court has defined an abuse of discretion is that if the district court misunderstands that there are judicially recognized constraints on its exercise of discretion, and here those restraints do exist. The district court is not in a position to make a determination on an excuse of neglect that's inconsistent with Thompson. And it's also not in a position to grant an extension of filing where it's done no analysis whatsoever on the question of whether or not injustice would otherwise result. This is an issue that the, may I have one moment to conclude this point? This is an issue that the district court acknowledged on page three of its order, that this is part of the part of the test. The failure of the district court to do any analysis of what injustice would otherwise result was noted by the city in its brief on pages 12, 14, and a lengthy footnote, footnote nine, on page 21. And Central Radio never addressed this element of the injustice test. There's nothing in their motion explaining what injustice would result if they don't get to appeal, and there's nothing in their response reply brief arguing against the city's position. And so to conclude and to follow up with your point, Judge Keenan, it isn't evident from the record in this case that any injustice would result here. By all accounts, they won their eminent domain challenge. Their property rights, as they say, their property rights were vindicated by the Virginia Supreme Court. They are pursuing this appeal in order to vindicate their right to free speech. So, all the very constitution that we all love and cherish. Absolutely. And so there is a principle being fought for here. What's not being fought for or what hasn't been explained is what injustice would happen in the event that the extension to appeal were not granted and they were not given this opportunity. So they were given an opportunity to explain what the injustice would be, but we have not seen it. Thank you, Mr. Melita. Mr. Bendis, you have some reserved time. Thank you, Your Honors. There's just a few points I'd like to address. The first, Judge Keenan, is the point you were making about the Nauticus Museum and the fact that it might not present the same traffic concerns that other signs could. I would direct Your Honor's attention to page 81 of the joint appendix, which includes a a multi-lane road running right in front of that sign. Your Honor, I apologize for not being familiar with that record site before, but I would direct Your Honor's attention to that now. With respect to the abortion protest signs that Mr. Melita addressed, he splits hairs when he says they didn't violate the sign code. The city acknowledges they violate the city code and the same zoning personnel who enforce the sign code enforce the city code. Yet, they were directed to ignore those signs. Again, ignore, ignore, ignore until ODU calls up. With respect to the anti-Obama sign, Your Honor, the city claims, well, it's not quite clear whether it was illegal or not. That's exactly the point. On every occasion, the city exercised what the district court called appropriate caution with political signs, except when it came to this sign. The city next tries to say, well, they talk about 25 years, but really they only ask for records going back five years. Your Honor, the testimony, one minute, Your Honor, please. I apologize for leaving my materials back there. Your Honor, the city's chief enforcement officer, Ms. Leslie Garrett, was asked about political signs in her deposition. She was asked, have you ever cited or given a warning to a political sign? Let me step back. Ms. Garrett has worked in the zoning department at that point 25 years. Have you ever cited or given a warning to a political sign before? Answer, no. Have you ever cited or given a warning to a protest sign before? Answer, no. Okay. Do you know of any circumstances where one of the inspectors that you supervise has done that? No. Do you know of any circumstances where a Department of Planning official cited a political or sign? No, I do not. That was a deposition? Yes, Your Honor. Was it a 30B6? That was not a 30B6 deposition, Your Honor. The city did designate witnesses in two other depositions, but that was not a 30B6. Your Honor, with respect to Your Honor's question about, Judge Gregory, Your Honor's question about the art exemption, that too is clearly content-based and also violates the prior restraint doctrine. Unlike in the public art exemption in Town of Cary, where the definition of art was actually set forth, where the court explained that it was set forth in terms reasonable people could understand, and where the definition was actually tied to aesthetics, here the city has no definition of art. And in a 30B6 deposition, when the city's designated witness, the Chief Planning Department Director, was asked whether it would be permissible to drape a copy of the Constitution across the entire side of a building, the city testified that that could well be considered art and therefore exempt from regulation. So you have a situation where you could drape the entire building with the Constitution, but Central Radio's banner protesting a violation of the Constitution was prohibited. And finally, Your Honor, with respect to the notice of appeal, the District Court did not abuse its discretion in finding that an extension was warranted. What the District Court did was exactly what it was supposed to do. It weighed the facts, it assessed credibility, it applied the four pioneer factors to the every other case that has addressed the factual scenario like this one, came to the conclusion that an extension was warranted. That is not an abuse of discretion, Your Honor. And finally, Your Honors, with respect to Judge Agee's question about the pay.gov system and some of the difficulties that attorneys had had using that system, I would direct Your Honor's attention to the Joint Appendix, page 1225, where Central Radio explains that it called the court's office after realizing that the notice had not been properly filed and it was explained to her that the court, quote, only recently began to use the pay.gov system to collect office fees and that they were not completely familiar with how it interacted with the CMECF system. So, Your Honor, there's evidence of the fact that there was not only confusion in this case, but there was an error. Ms. Perez also testified that she was never returned back into the ECF system after uploading the notice of appeal, paying the docketing fee, and receiving an email confirmation with Eastern District of Virginia CMECF in the subject line confirming receipt. Your Honor, in those circumstances, like every other case addressing the same circumstances that are laid out in our brief, the District Court correctly concluded that an extension was warranted. That was not an abuse of discretion. Thank you, Your Honors. Thank you. We're going to come down, greet counsel, and then take a brief reset.
judges: Roger L. Gregory, G. Steven Agee, Barbara Milano Keenan